**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **QUKULKHAN SHAHBAZ NAGAQIXI AMARU**, *et al.*, | § § § | |
| **Plaintiffs,** | § § | |
| | § | **Civil Action No. 4:22-cv-01090-O-BP** |
| **v.** | § § | |
| | § | **(Consolidated with Civil Action No. 4:22-** |
| **RHOME POLICE DEPARTMENT,** *et al.*, | § § | **cv-01096-P-BJ)** |
| | § | |
| **Defendants.** | § § | |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**</u>

Before the Court is Plaintiffs' "Motion to Challenge Constitutionality of Texas Statute 544.011 – Tex. Transp. Code § Sec. 544.011. Section 544.011 – Lane Use Signs Pursuant to Rule 5.1 of Federal Rules of Civil Procedure." ECF Nos. 74-75.

Also before the Court are filings relating to the Complaint of Qukulkhan Amaru ("Mr. Amaru"): the Rule 12(b)(6) Motion to Dismiss (ECF No. 23) of Defendant Marissa Martinez ("Martinez"), Plaintiffs' Response (styled as a reply, as are many of Mr. Amaru's Responses) (ECF No. 51), and Martinez's Reply (ECF No. 54); the Motion to Dismiss Plaintiffs' Complaints and Brief (ECF No. 28) of Defendant Mark Moore ("Moore"), Plaintiffs' Response (ECF No. 53), and Moore's Reply (ECF No. 59); the Motion to Dismiss Plaintiffs' Complaints and Brief (ECF No. 29) of Defendant Eric Debus ("Debus"), Plaintiffs' Response (ECF No. 51), and Debus' Reply (ECF No. 58); and the Motion to Dismiss Plaintiffs' Complaints and Brief (ECF No. 30) of Defendant the City of Rhome ("the City"), Plaintiffs' Response (ECF No. 52), and the City's Reply (ECF No. 57). The Court refers to Martinez, Moore, Debus, and the City collectively as "Defendants."

Also pending are filings relating to the Complaint of Mulukah Amaru ("Ms. Amaru") from the consolidated case: the City's Motion to Dismiss (ECF No. 98) and Brief (ECF No. 99), Plaintiffs' Response (ECF No. 114), and the City's Reply (ECF No. 119); Moore's Motion to Dismiss (ECF No. 100) and Brief (ECF No. 101), Plaintiffs' Response (ECF No. 112), and Moore's Reply (ECF No. 117); Debus' Motion to Dismiss (ECF No. 102) and Brief (ECF No. 103), Plaintiffs' Response (ECF No. 115), and Debus' Reply (ECF No. 118); Martinez's Rule 12(b)(6) Motion to Dismiss (ECF No. 106) and Brief (ECF No. 107), Plaintiffs' Response (ECF No. 113), and Martinez's Reply (ECF No. 116); and additional attachments (ECF Nos. 108-110). The Court has considered the Plaintiffs' recent Responses (ECF Nos. 112, 113, 114, 115), although Plaintiffs filed them out of time. *See* ECF No. 120.

After considering the pleadings and applicable legal authorities, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **DENY** the Plaintiffs' constitutional challenges (ECF Nos. 74-75, and earlier versions of those challenges, ECF Nos. 37, 38, 39, 40, 61), **GRANT** the Defendants' Motions (ECF Nos. 23, 28, 29, 30, 98, 100, 102, 106) and **DISMISS** Plaintiffs' claims with leave to amend, except as to their claims based on criminal law and those asserted on behalf of their minor children, which Judge O'Connor should dismiss without leave to amend.

## I.    BACKGROUND

### A.    Facts

On April 29, 2022, outside of Rhome, Texas, Mr. Amaru was driving a car in which Ms. Amaru was a passenger. ECF No. 4 at 7. Rhome Police Officer Moore pulled them over near a gas station. *Id*. A video the Plaintiffs submitted on a USB drive shows several other officers present, as well. *See id*. at 16 (hereinafter "Video"). Moore stated that he stopped the car because

Mr. Amaru had been driving in the left lane too long. *Id*. at 7. According to Plaintiffs, Moore began asking them "harassing" questions, such as whether there were drugs or a dead body in their car. *Id*.

Moore then asked if he could search the vehicle. *Id*. at 7. Plaintiffs said no. *Id*. Moore called for backup, and after Officer Martinez arrived with a narcotics dog, the dog sniffed the car, and officers searched it. *See id*. The parties dispute whether the narcotics dog alerted before the search. *Compare* ECF No. 101 at 10 and ECF No. 112 at 27. Plaintiffs allege that this search was conducted "without warrant or probable cause." ECF No. 4 at 7.

Mr. Amaru alleges that Moore "kidnapped" him in the backseat of his police car and turned the air conditioner on, though he had told Moore not to do so. *Id*. at 8. This resulted in Mr. Amaru "freezing" in the back of the car. *Id*.

Ms. Amaru alleges that "… Moore falsely arrested and Trooper Womack handcuffed [her] from behind under duress without a warrant or being lawful and without a crime, offense or disturbance of the peace." ECF No. 3 at 7 (consolidated case). She claims that Trooper Womack illegally searched her bag without probable cause and by using excessive force, though she does not describe the nature of this force. ECF No. 14 at 10. In their responses to the Court's questionnaires, Plaintiffs did not list Trooper Womack as a defendant when the Court asked for the names of all defendants from whom the Plaintiffs sought damages. *Id*. at 57; ECF No. 15 at 57. Trooper Womack is therefore not a defendant in this case.

Ms. Amaru also alleges that one or more defendants unlawfully detained her in the street, causing "mental anguish and embarrassment." ECF No. 14 at 10. She alleges that her children saw her get pulled over and detained, which made them "scared and worried for their mother." *Id*. Moore refused to allow Ms. Amaru to use the restroom, and she explains that he assumed that

she "was hiding drugs somewhere when there was no reason for suspicion or probable cause to think there were any drugs present." *Id*. She asserts that "Defendants performed an illegal stop and frisk on [Ms. Amaru] without objectively reasonable suspicion and this caused mental anguish and embarrassment." *Id*. at 7.

Ultimately, Moore issued a written warning to the Plaintiffs (ECF No. 112 at 39-41) and let them go. Video at 6:20-7:20. Although the exact duration of the stop is not reflected in the record, the Video excerpts the Plaintiffs provided suggest that the stop lasted roughly an hour. *See generally* Video. The Plaintiffs were not taken to jail or charged with any criminal offense. *See* ECF No. 14 at 56.

**B.    Claims and Responses**

**1.    Constitutional Challenge**

Plaintiffs challenge the constitutionality of Texas Transportation Code Section 544.011, pursuant to Rule 5.1 of the Federal Rules of Civil Procedure. *See, e.g*., ECF No. 75. They argue that the statute is unconstitutionally vague, and that it is a basis for racial profiling and unconstitutional search and seizure. *Id*. at 2. They also assert that there was "no visible signage saying 'LEFT LANE FOR PASSING ONLY' in the area" near where they were stopped. *Id*. The Court certified the constitutional challenge to the attorney general of the State of Texas and provided him more than sixty days to intervene. ECF No. 83, Fed. R. Civ. P. 5.1(b)-(c). He did not do so. The defendants similarly have not responded to this constitutional challenge.

**2.    Constitutional Claims**

Plaintiffs also bring a variety of causes of action against Defendants, including four constitutional causes of action which the Court construes under 42 U.S.C. § 1983. First, they allege violations under the Fourth Amendment for unreasonable search and seizure (*see, e.g*., ECF

No. 4 at 10), and excessive force (*see, e.g.*, ECF No. 14 at 12, 17). Second, they allege racial profiling in violation of the Equal Protection Clause. *See, e.g.*, ECF No. 4 at 10-11. Third, they allege that Defendants violated Mr. Amaru's Fifth Amendment rights when they "coerced" him into providing incriminating information concerning Ms. Amaru. *See, e.g.*, ECF No. 14 at 37-38, ECF No. 15 at 12, 15, 42. Fourth, Ms. Amaru appears to allege that Defendants violated her Fourteenth Amendment right to be free from deliberate indifference to her serious medical needs by not permitting her to use the restroom during the traffic stop. *See, e.g.*, ECF No. 14 at 8, 12.

In response, Moore argues that the Plaintiffs failed to state a claim on their Fourth Amendment claims for unreasonable search and seizure and for excessive force. ECF No. 28 at 16-20. He also argues that they failed to state an Equal Protection Clause claim for racial profiling. ECF No. 28 at 20. The Defendants do not respond to the Plaintiffs' Fifth Amendment or deliberate indifference claims. Moore also argues that several other causes of action are subsumed within the Plaintiffs' Fourth Amendment causes of action, and that he is entitled to qualified immunity. ECF No. 28 at 21-24. Debus argues similarly, also noting that he was not personally involved in the incident and cannot be held liable for failure to train or supervise under a *respondeat superior* theory. ECF No. 29 at 15-22. Likewise, Martinez asserts that the Plaintiffs have not stated a claim against her on any of their constitutional claims, and that in any case, she is entitled to qualified immunity. ECF No. 24 at 3-4. The City claims that it cannot be held liable for any constitutional violations associated with this traffic stop because the Plaintiffs have not plausibly pleaded municipal liability. ECF No. 30 at 11-14.

### 3. Criminal Claims

The Plaintiffs assert violations of certain criminal statutes, including 18 U.S.C. §§ 241-42 and 1201 (*see, e.g.*., ECF No. 4 at 9, ECF No. 3 at 9 (consolidated case)); 25 C.F.R. § 11.404 (ECF

No. 4 at 3, ECF No. 3 at 7 (consolidated case)); and the Uniform Code of Military Justice (10 U.S.C. § 897, Art. 97). Plaintiffs also assert a violation of the Texas Penal Code §20.02. ECF No. 4 at 4, 11-12; ECF No. 3 at 4, 11-12. In their questionnaire responses, they also cite and quote various portions of the Texas Code of Criminal Procedure. ECF No. 15 at 21-25.

The Defendants respond that private plaintiffs cannot bring a cause of action under federal criminal statutes (ECF Nos. 28 at 30-31, 24 at 5, 29 at 28-29, 30 at 19-20) and the Texas Penal Code (ECF Nos. 28 at 30, 24 at 5, 29 at 28, and 30 at 18-19). Moore, Debus, and the City also briefly note that 25 C.F.R. § 11.404 and 10 U.S.C. § 897, Art. 97 are not applicable to the instant case. ECF No. 28 at 2, 29 at 2, and 30 at 2, respectively. Martinez did not address these statutes' provisions. The Defendants did not respond to the Plaintiffs' references to the Texas Code of Criminal Procedure.

### 4.    State Law Claims

Plaintiffs also bring various claims under state law, specifically false imprisonment (*see, e.g.*, ECF No. 4 at 9; ECF No. 3 at 9 (consolidated case)); battery (*see, e.g.*, ECF No. 4 at 11, ECF No. 3 at 11 (consolidated case)); intentional infliction of emotional distress (*see, e.g.*, ECF No. 4 at 4); liberally construed, negligent implementation of a policy (ECF No. 15 at 20; ECF No. 4 at 9; ECF No. 14 at 40); and violation of Article I, Section 9 of the Texas Constitution. ECF No. 15 at 24.

Defendants argue that the Court should dismiss all of Plaintiffs' state tort claims dismissed under the Texas Tort Claims Act. ECF Nos. 28 at 24, 24 at 4-5, 29 at 22-26, and 30 at 14-17. They also assert that the Court should dismiss their state constitutional claims because Texas law does not provide a private right of action to recover money damages against them for violations of provisions of the Texas constitution. ECF Nos. 28 at 28-29, 24 at 5, 29 at 27, and 30 at 17-18.

### 5.    Claims for Lack of Transparency

The Plaintiffs also assert that the City does not comply with various federal and state transparency laws. ECF No. 15 at 40-41. The Defendants do not respond to the Plaintiffs' claims. Since the actions at the traffic stop do not create a case or controversy regarding compliance with these laws, and since Plaintiffs have not shown that they have standing to contest these laws (as they have not explained why they were injured by the City's alleged noncompliance), the Court recommends that Judge O'Connor dismiss all such claims. ECF No. 15 at 40-41; U.S. Const. art. III, §2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

### 6.    Claims Raised Solely in a Response

Additionally, in a Response, Plaintiffs also raise the Thirteenth Amendment, 18 U.S.C. § 1581, the Civil Rights Act of 1866, the 1887 Interstate Commerce Act, and the Civil Rights Act of 1964 when discussing the racism they allegedly faced at the hands of the Defendants. ECF No. 32 at 2. However, since Plaintiffs did not assert these claims in their original complaints (or questionnaire responses), they are not properly before the Court. *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."). To the extent that plaintiffs briefly refer to "Federal and state civil rights acts" in a questionnaire response (ECF No. 15 at 43), this mention does not suffice to state a plausible claim to survive dismissal under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 7.    Claimed Harm and Damages

Plaintiffs assert that Defendants' actions caused them psychological and economic harm, *See* ECF No. 15 at 9; ECF No. 14 at 8-9 (consolidated case). They argue that Defendants' alleged racial profiling caused economic consequences "in lost time from work, legal consultation fees,

and caused burdens associated with false accusations and unnecessary interactions with law enforcement." ECF No. 14 at 8. They allege that Moore's search and seizure harmed their reputation and social standing. *Id.* at 17, ECF No. 15 at 17-18.

Ms. Amaru alleges that Defendants' actions also harmed her physically. She asserts that the "[f]orceful and aggressive search by handcuffing" led to a "sore wrist and stretched bladder." ECF No. 14; *see also* ECF No. 14 at 32. She also asserts that her children "have light trauma" because of the alleged unlawful search. *Id.* at 17.

Plaintiffs seek both injunctive and monetary relief. They request that the officers involved be fired and the police department be retrained. ECF No. 4 at 6, 14; ECF No. 3 at 6 (consolidated case). They also seek $6,000,000 in compensatory damages, "punitive damages, pain and suffering (mental anguish), and medical expenses because of violations committed" by the Defendants. *Id.* They explain that the incident "caused psychological and medical expenses of $44,000 and $10,000." ECF No. 15 at 32, 59; ECF No. 14 at 59. They also seek court costs and fees. ECF No. 4 at 14, ECF No. 3 at 15 (consolidated case).

## II.    LEGAL AUTHORITIES

### A.    Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of complaints that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a viable claim for relief, a complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion, courts must "take all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff ... and ask whether the pleadings contain 'enough facts to state a claim to relief that is plausible on its face.'" *Yumilicious Franchise, LLC v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016)

(citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A statute of limitations may support dismissal under Rule 12(b)(6) when it is evident from the plaintiff's pleadings that the action is barred, and the pleadings fail to raise some basis for tolling or avoidance of the bar. *Jones v. ALCOA, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).

**B.    Qualified Immunity**

"Qualified immunity shields government officials performing discretionary functions from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). "[T]he immunity issue must be resolved at the earliest possible stage of the litigation since it entails an entitlement to immunity from suit and not merely a defense to liability." *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 226 (1991)). Qualified immunity can be decided at the motion to dismiss stage as it is the earliest possible stage in litigation. *Carswell v. Camp*, 37 F.4th 1062, 1068 (5th Cir. 2022).

To overcome the defense of qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations omitted). A good-faith assertion of qualified immunity alters the usual burden of proof, shifting it to the plaintiff to show that the defense is not available. *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 376 (2020).

### C.    Pro Se Plaintiffs

A pro se plaintiff's pleadings are liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106, (1976). A pro se complaint, "'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers....'" *Id*. (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). If the district court determines that a plaintiff has pleaded his or her best case, however, the court does not err in dismissing a pro se complaint with prejudice. *Jones v. Greninger*, 188 F.3d 322, 326–27 (5th Cir. 1999) (citing *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998); *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)).

### D.    Dismissal With or Without Leave to Amend

There is a "well-established policy that the plaintiff be given every opportunity to state a claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)). It is federal policy to decide cases on the merits rather than technicalities, and the Fifth Circuit thus recommends that suits be dismissed without prejudice on Rule 12 motions. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). As a result, courts generally allow plaintiffs at least one opportunity to amend following a Rule 12 dismissal on the pleadings, "unless it is clear that the defects are incurable." *Id*. An incurable defect may arise when a complaint's facts are "not actionable as a matter of law." *Id.* In such situations, amendment would be futile, and dismissal with prejudice is appropriate. *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 566 (5th Cir. 2003). Courts may also appropriately dismiss an action with prejudice if the court finds that the plaintiff has alleged his best case. *Jones*, 188 F.3d at 327.

III.    **ANALYSIS**

A.    **The Court should dismiss Plaintiffs' claims against Debus and the City.**

The Court should dismiss Plaintiffs' claims against Debus, as the Plaintiffs do not state any facts to show that he was personally involved in the traffic stop or was present at the scene. ECF No. 29 at 18, *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). In a response, Plaintiffs appear to pursue a *respondeat superior* theory against Debus that also addresses the concept of "failure to train," writing that he "is responsible for ensuring all of his officers get the proper training" and that he "is also responsible for Rhome Officers and what happens in his jurisdiction because he is the Chief Officer at Rhome Police Department." ECF No. 115 at 30. But because there is no *respondeat superior* liability under 1983, other individual defendants did not violate Plaintiffs' Constitutional rights, and Plaintiffs' other claims are unavailing, there is nothing to hold Debus responsible for in the instant case. *See Goodman v. Harris Cnty*, 571 F.3d 388, 395 (5th Cir. 2009) (listing "the violation of the plaintiff's rights" as part of an element of supervisory liability for failure to supervise or train under § 1983); *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) (rejecting *respondeat superior* liability under 42 U.S.C. § 1983).

Similarly, the Court should dismiss Plaintiffs' constitutional claims against the City. In essence, Plaintiffs' pleadings allege that individual City police officers violated their constitutional rights under the Fourth, Fifth, and Fourteenth Amendments. However, Plaintiffs have not adequately pleaded facts to show the City's liability.

To plead municipal liability under § 1983, Plaintiffs must allege that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009); *see also*

*Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

The first element of *Monell* requires Plaintiffs to show an official policy, which is:

1.    A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2.    A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

The second element requires Plaintiffs to plead that the person acting on behalf of the municipality was an official policymaker. *Peterson*, 588 F.3d at 847. The policymaker must have final policymaking authority and take the place of the governing body in a designated area of the municipality's administration. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984); *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984). A municipality's governing body may delegate policymaking authority expressly or implicitly. *Bennett*, 728 F.2d at 769.

The third element requires Plaintiffs to show that a policy is the moving force behind a constitutional violation. *Peterson*, 588 F.3d at 847. To do so, Plaintiffs must show "a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski*, 237 F.3d at 580. For an official policy to be the moving force behind a constitutional violation, the policymaker must have acted with "deliberate indifference" to the policy's known or obvious unconstitutional consequences. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410

(1997). To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety. *Id; see McClendon v. City of Columbia,* 305 F.3d 314, 326 n.8 (5th Cir. 2002).

Plaintiffs have not stated facts to meet the requisite legal standards. Specifically, even if Debus were an official policymaker and his alleged failure to train were an official policy, Plaintiffs have not plausibly pleaded facts showing that any such failure was the moving force behind a constitutional violation, because they have not plausibly pleaded a violation of their constitutional rights. *Peterson*, 588 F.3d at 847. Similarly, they plead no facts showing that any of the individual defendants' actions resulted from a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Johnson*, 958 F.2d at 94. Therefore, Plaintiffs have not stated a plausible constitutional claim against the City, and the Court should dismiss their claims on that basis.

### B. The Plaintiffs have not stated a constitutional violation by Moore or Martinez.

#### 1. Under the Fourth Amendment, a traffic stop requires reasonable suspicion.

The Fourth Amendment's guarantee against unreasonable searches and seizures extends to traffic stops, and Courts "analyze the constitutionality of a traffic stop under the two-step test from *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Daniel*, No. 23-30491, 2024 WL 1929013, at *3 (5th Cir. May 2, 2024); U.S. Const. amend. IV; *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013) (Fourth Amendment guarantees "extend[ ] to vehicle stops and temporary detainment of a vehicle's occupants").

Under *Terry*, courts first determine "whether the officer's action was justified at its inception." *Daniel,* 2024 WL 1929013, at *20. "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Second, courts address whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. However, "if the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010).

Brief traffic stops require neither a warrant nor probable cause. *See Terry*, 392 U.S. at 20. However, such a stop does require "reasonable suspicion." *Lopez-Moreno*, 420 F.3d at 430. "[S]uspicion is reasonable if it is based on specific and articulable facts and the rational inferences that can be drawn therefrom." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). "Although a mere 'hunch' does not create reasonable suspicion[ ] ... the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. Cal.*, 572 U.S. 393, 397 (2014) (internal quotation marks and citations omitted).

Determining whether an officer had reasonable suspicion requires courts to "examine ... the totality of the circumstances known to the [officer] when [he] made the investigatory stop and [his] experience in evaluating such circumstances." *Guerrero-Barajas*, 240 F.3d at 433. "We give due weight to the officer's factual inferences because officers may 'draw on their own experience

14

and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Smith*, 952 F.3d 642, 648 (5th Cir. 2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citations and quotations in *Arvizu* omitted)).

Accordingly, the Court considers whether Moore had reasonable suspicion to pull the Plaintiffs over for violating Tex. Transp. Code. § 544.011 (Lane Use Signs) and—after addressing the constitutionality of that statute—examines whether Moore and Martinez's subsequent actions during the traffic stop were reasonably related in scope to the circumstances supporting the initial stop, or whether reasonable suspicion separately supported them. *See Terry*, 392 U.S. at 20; *Pack*, 612 F.3d at 350.

> **2.    Even if Moore lacked reasonable suspicion to pull the Plaintiffs over under Tex. Transp. Code. § 544.011 (Lane Use Signs), he is entitled to qualified immunity.**

Texas Transportation Code Section 544.011 (Lane Use Signs) reads in its entirety:

> If, on a highway having more than one lane with vehicles traveling in the same direction, the Texas Department of Transportation or a local authority places a sign that directs slower traffic to travel in a lane other than the farthest left lane, the sign must read "left lane for passing only."

Tex. Transp. Code. § 544.011 (Lane Use Signs).

 The Fifth Circuit interpreted this statute at length in *United States v. Rodriguez*, 802 F. App'x 90, 93 n.2 (5th Cir. 2020), reading it in conjunction with Section 544.004 of the Transportation Code. It noted that "[t]he Texas Court of Criminal Appeals has held that a violation of §544.004 occurs when one drives in the left-hand lane without passing another vehicle and there exists a 'left lane for passing only' sign . . . present within a reasonable distance

of the traffic stop." *Id*. at 93. It also provided a multi-factor test to determine whether reasonable suspicion supports a traffic stop for driving in the left lane without passing:

> To determine whether the stop was supported by reasonable suspicion, we consider 'the totality of the circumstances' giving rise to the traffic stop, including [1] whether the sign applies to [the motorist], [2] whether [the motorist] had a credible alternative reason for driving in the left lane, and [3] whether [the officer] provided [the motorist] an opportunity to switch lanes before stopping her.

*Rodriguez*, 802 F. App'x at 94. The parties have not addressed whether the second and third factors have been met, and the Plaintiffs address the first factor only as part of their constitutional challenge. ECF No. 75. But even assuming that "the facts support a reasonable inference" that Mr. Amaru did not drive past a "left lane for passing only" sign before being pulled over (ECF No. 112 at 19; *Rodriguez*, 802 F. App'x at 94), and that this is enough to state a claim for violating the Fourth Amendment, Moore still would not be liable to Plaintiffs due to qualified immunity.

 For the purposes of qualified immunity, it is clearly established that a lawful traffic stop requires reasonable suspicion of a legal violation. *See, e.g.*, *Terry*, 392 U.S. at 20, *Lopez-Moreno*, 420 F.3d at 430. However, it is not clearly established that an officer only has reasonable suspicion that a violation of Sections 544.011 and 544.004 of the Texas Transportation Code has occurred if the motorist drove past a sign warning that the left lane was for passing only. One reasonable officer could believe that the best interpretation of *Rodriguez*, *Castillo,* and the text of the Texas Transportation Code is that notice of the sign is required. But another could interpret *Rodriguez* to mean that *Castillo* is overruled and that an officer need not demonstrate that a motorist had notice of the sign if the other two *Rodriguez* factors are met. *See also United States v. Castillo*, 804 F.3d 361, 365 (5th Cir. 2015) ("For a driver in the left lane to violate the sign-compliance provision, he must have notice, i.e., there must be a sign 'within a reasonable

distance of the traffic stop.'"); Texas Transportation Code § 544.004 ("A provision of this subtitle requiring an official traffic-control device may not be enforced against an alleged violator if at the time and place of the alleged violation the device is not in proper position and sufficiently legible."). Because the law was not settled so that every reasonable officer facing this situation would know that notice of the sign was required, qualified immunity would shield Moore from liability on this point even if he lacked reasonable suspicion when he pulled the Plaintiffs over for driving in the left lane too long. *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018).

### 3.    Texas Transportation Code. § 544.011 (Lane Use Signs) is not unconstitutionally vague.

Plaintiffs challenge the constitutionality of § 544.011 (Lane Use Signs) on the basis that the statute is unconstitutionally vague on its face. ECF No. 75 at 2. They also challenge the constitutionality of this statute as applied because it "gives no clear notice of what is unlawful and what is lawful," because it "is used as a tool to racially profile the [P]laintiffs," and because it is "used to search and seize [P]laintiffs without probable cause or an articulable suspicion that a crime was or is being committed" (as no visible signage saying "LEFT LANE FOR PASSING ONLY" was in the area where Plaintiffs were arrested). *Id.* Defendants have not responded to these arguments, nor has the Texas Attorney General.

The undersigned construes Plaintiffs' challenges as alleging that "[t]his ordinance is void for vagueness, both in the sense that it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, and because it encourages arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (internal citations and quotations omitted). The Court considers the challenges to the statute on its face and as applied to the Plaintiffs.

"A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights." *Cnty. Court of Ulster Cnty., New York v. Allen*, 442 U.S. 140, 154-55 (1979). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). Under these authorities, and particularly considering that the Plaintiffs did not receive a citation for driving in the lefthand lane too long, the Plaintiffs do not have standing to challenge the statute's constitutionality. But even if this statute had an adverse impact on the Plaintiffs' rights, it is not unconstitutionally vague on its face or as applied.

A Texas state court previously ruled that the statute was not unconstitutionally vague. *Baker v. State*, 50 S.W.3d 143 (Tex. App.—Eastland [11th Dist.] 2001, pet. denied). In rejecting the challenge, the court explained that a statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Id*. at 145-46 (quoting *Papachristou*, 405 U.S. 156 at 162). The court explained that "people of ordinary intelligence would know from reading the sign that the left lane was for passing only . . . . We think that a person of ordinary intelligence would know when the person is no longer passing a vehicle and must move from the left lane." *Id*. at 146. The court also rejected the argument that the statute "encourage[s] arbitrary and erratic arrests and convictions," specifically explaining that "the language of the traffic control sign provides guidance to law enforcement authorities to such a degree that improperly-motivated selective enforcement is obviated." *Id*. "The standards to apply are explicit. If it is in the left lane, the vehicle should be in the process of passing other vehicles. If it is not passing other vehicles, the vehicle should not be in the left lane." *Id*.

The court in *Baker* correctly found that a sign reading "LEFT LANE FOR PASSING ONLY" gives a person of ordinary intelligence fair notice of what conduct the sign forbids, and

18

the sign does not encourage arbitrary arrests. Furthermore, as explained below, the statutes related to such signs also are not unconstitutional on their face.

The plain text of Tex. Transp. Code. § 544.011 (Lane Use Signs) gives clear notice to the Texas Department of Transportation and other local authorities that whenever they are placing a sign that intends to keep slower-moving traffic out of the left-most lane on a one-way multi-lane highway, the sign must read "left lane for passing only." The Fifth Circuit reads § 544.011 together with § 544.004 when addressing cases in which authorities pull a motorist over for driving in the left lane too long. *Rodriguez*, 802 F. App'x at 93 n.2. Section 544.004(a) reads:

> The operator of a vehicle or streetcar shall comply with an applicable official traffic-control device placed as provided by this subtitle unless the person is: (1) otherwise directed by a traffic officer, police officer, or escort flagger; or (2) operating an authorized emergency vehicle and is subject to exceptions under this subtitle.

Although Plaintiffs did not explicitly challenge Section 544.004(a), that section gives a person of ordinary intelligence fair notice that the driver must comply with traffic control devices unless certain narrow exceptions apply.

Read together, the two provisions give motorists fair notice that when they see a sign reading "left lane for passing only," they need to comply with it as described in *Baker,* or else be subject to getting a ticket. Therefore, the statutes are not unconstitutionally vague on their face. Additionally, even if the statutes were unconstitutionally vague, this does not make a traffic stop based on them unconstitutional. *See United States v. Inocencio*, 40 F.3d 716, 728 (5th Cir. 1994) ("A prudent officer, in the course of determining whether respondent had committed an offense, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.").

The Plaintiffs' as-applied challenge is unavailing as well. Plaintiffs have not plausibly pleaded that the defendants in this case violated their constitutional rights. Therefore, their argument that the challenged statute—as applied against them—led to unconstitutional racial profiling and unreasonable search and seizure is also not viable. ECF No. 75 at 2.

Accordingly, the Court should deny Plaintiffs' constitutional challenges (ECF Nos. 74, 75) and earlier versions of those challenges (ECF Nos. 37, 38, 39, 40, 61).

### 4.    Moore's and Martinez's post-stop conduct was not actionable.

According to Plaintiffs, after pulling them over, Moore began asking them "harassing" questions about the presence of drugs or a dead body in their car. ECF No. 4 at 7. But in general, "an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop." *Pack*, 612 F.3d at 349. "[N]o Fourth Amendment harm is done where the officer asks the occupant of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed." *Id*. Although a short period is permissible, the Fifth Circuit has found that extensively questioning subjects on topics unrelated to the purpose of the stop for eight minutes prior to running the computer background check impermissibly extends the stop and violates the Fourth Amendment in the absence of reasonable suspicion. *United States v. Macias*, 658 F.3d 509, 519-522 (5th Cir. 2011).

Plaintiffs do not specify how long Moore questioned them on unrelated topics before beginning the criminal background check, nor do they more generally allege that this questioning prolonged the stop. Their concerns appear to be with the content, rather than with the length, of the questioning. ECF No. 4 at 7. Accordingly, Plaintiffs have not raised a right to relief "above the speculative level" that Moore's unrelated questioning impermissibly extended the traffic stop

in violation of their Fourth Amendment rights. *Twombly*, 550 U.S. at 555. Under *Terry*'s second step, Moore's and Martinez's subsequent actions during the traffic stop were reasonably related in scope to the circumstances supporting the initial stop (or justified by reasonable suspicion gained during the initial stop). *See Terry*, 392 U.S. at 20; *Pack*, 612 F.3d at 350.

### 5.    Defendants' searches of Plaintiffs' property were lawful.

#### a.    Moore had reasonable suspicion to extend the traffic stop to have a narcotics dog sniff Plaintiffs' vehicle.

In *Rodriguez v. United States*, the Supreme Court addressed "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." 575 U.S. 348, 353 (2015). The Court explained that "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355; *see also Weisshaus v. Teichelman*, No. 22-11099, 2024 WL 620372, at *5 (5th Cir., Feb. 14, 2024) (under *Rodriguez*, dog-sniff beyond the duration of the initial traffic stop required reasonable suspicion).

The Court also explained that an officer's mission includes "ordinary inquiries incident to" the traffic stop, which typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* But "[a] dog sniff, by contrast, is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (internal citations and quotations omitted). "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized

as part of the officer's traffic mission." *Id*. Accordingly, the "critical question" is whether the dog sniff prolongs the stop. *Id*. at 356. If so, the sniff requires reasonable suspicion. *Id.* at 355.

Construing the facts in Plaintiffs' favor as required at the motion to dismiss stage, the Court finds that the traffic-related portion of the stop had already been completed by the time the dog sniff occurred. Thus, the question becomes whether Moore had reasonable suspicion to prolong the stop to have the narcotics dog sniff Plaintiffs' car.

Moore's brief in support of his motion to dismiss does not explain his reasonable suspicion to prolong the stop for a dog sniff (ECF No. 28), nor do any of the briefs of the other defendants. *See, e.g.,* ECF Nos. 29, 30, 24. Moore addresses this issue to an extent in a declaration (ECF No. 81), but he did not offer this declaration in support of his motion to dismiss.

The Video provides evidence of why Moore had reasonable suspicion to order a dog sniff. In the Video, Moore explains that Ms. Amaru told him she had no criminal record, but that his dispatcher said she did. Video at 5:25-5:35. "Because making a material, false statement during the investigation of a traffic stop is itself a crime under Texas law, it is hard to argue that an officer would not have reasonable suspicion of criminal activity when confronted with a statement reasonably viewed as false and material to his investigation…." *Pack*, 612 F.3d at 360. Accordingly, Moore had reasonable suspicion to prolong the traffic stop to conduct an open-air dog sniff.

**b.    The dog's alert following the sniff provided probable cause to search the vehicle.**

Defendants state that the narcotics dog alerted on the vehicle (ECF No. 101 at 10), and the Video supports this conclusion. Mr. Amaru spoke back and forth with Moore about whether the dog alerted. Video at 5:44-6:10. Mr. Amaru said that "when the dog came around and sniffed, she said it was clear." *Id.* Moore stated that the dog handler told him the dog had alerted and that

"if that dog didn't alert and [Martinez, the dog handler] saw me searching, just being a misunderstanding, she would have told me." *Id*.

In *Sullivan v. Garza Cnty. Sheriff's Office*, the Court recently addressed whether "there was probable cause to search [the *Sullivan* plaintiffs'] vehicle despite [their] assertion that [the drug-sniffing dog] did not alert." 5:23-cv-049-H-BQ, 2023 WL 9219306, at *10 (N.D. Tex. Nov. 3, 2023), *rec. adopted,* 2024 WL 133425 (N.D. Tex. Jan. 11, 2024). The plaintiffs in *Sullivan* contended that an officer lied that the dog had alerted, thus fabricating evidence. *Id*. at 12. After describing the *Sullivan* plaintiffs' account as "contradictory," the Court in *Sullivan* concluded that "Plaintiffs' mere belief, however, that [the dog] did not alert does not establish a constitutional violation under the Fourth Amendment." *Id*. at *14. The same reasoning applies here: Plaintiffs' "mere belief" that the dog did not alert does not raise their right to relief on this point above a speculative level, particularly given Moore's explanation in the Video. *Id*.; Video at 5:44-6:10.

"When a dog's alert is the purported basis for probable cause, '[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.'" *Florida v. Harris*, 568 U.S. 237, 248 (2013). The Plaintiffs do not appear to argue that the narcotics dog used was not certified or was otherwise unreliable—although the Defendants have not identified the dog or stated whether the dog was certified or otherwise reliable. *See id*. Nevertheless, applying the Court's conclusion in *Sullivan* and the Fifth Circuit's recent statement in that "our court has repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search," *Weisshaus*, 2024 WL 620372, at *4, the Court concludes that the Defendants had probable cause to search the Plaintiffs' car.

23

        c.       **The dog's alert following the sniff, coupled with Ms. Amaru's false statement to Moore, provided probable cause to seize Mr. Amaru and Ms. Amaru.**

The Fifth Circuit does not appear to have explicitly ruled on whether a positive dog alert, standing alone, creates probable cause for an arrest (in contrast to a search), although it has acknowledged that "other circuits, however, have held that a dog alert provides probable cause to arrest." *United States v. Mendez*, 27 F.3d 126, 129 n.5 (5th Cir. 1994). It also explained that a prior case, *United States v. Williams*, 69 F.3d 27, 28 (1995), has been "mistakenly cited for the proposition that a dog alert alone" suffices for probable cause for a warrantless arrest. *Resendiz v. Miller*, 203 F.3d 902, 903 n. 1 (5th Cir. 2000). Rather than taking the stance that a dog alert alone suffices for probable cause to arrest, the Fifth Circuit emphasizes "the totality of facts and circumstances known to the officers at the time of the arrest." *Id.* at 903-04.

As explained above, it appears Ms. Amaru incorrectly or falsely told Moore she had no criminal record, which itself establishes reasonable suspicion. Video at 5:25-5:35; *Pack*, 612 F.3d at 360. Taken together, the dog's alert on the vehicle plus Ms. Amaru's false statement established probable cause to arrest her. *See, e.g.*, *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) ("[t]he Supreme Court has defined probable cause as the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.") (internal citations and quotations omitted); *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (a warrantless arrest requires probable cause). Whether the detention of Mr. Amaru and Ms. Amaru was a stop or an arrest, such probable cause also would establish the requisite reasonable suspicion for this form of seizure, as reasonable suspicion is a lower standard than probable cause. *United States v. Sokolow*, 490 U.S. 1, 2 (1989) (reasonable

suspicion requires "some minimal level of objective justification for making a stop" but "less than the level of suspicion required for probable cause.").

Therefore, Martinez did not violate the Fourth Amendment by handcuffing Ms. Amaru, and Moore did not violate it by detaining Mr. Amaru in the back of the patrol car. Both seizures were lawful based on a positive narcotics dog alert plus a materially false statement from someone in the car, establishing probable cause to arrest them both. *See United States v. Del Hierro-Vega*, 760 F. App'x 301, 305-06 (5th Cir. 2019) ("Del Hierro was found in the car with Chavez, a suspected criminal for whom the agents had independent probable cause for an arrest . . . Del Hierro was found inside a vehicle that agents had good reason to believe was still involved in a criminal conspiracy. There was probable cause for this lawful arrest.").

### d.    The search of Ms. Amaru's purse was constitutional.

Plaintiffs did not discuss the location of Ms. Amaru's handbag when officers searched it. ECF No. 3 at 7. Accordingly, the undersigned analyzes the search (1) as if the bag were inside the car; and (2) as if the bag were outside the car and near Ms. Amaru when officers searched it.

"The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). Plaintiffs complain that the search was made without a warrant (*see, e.g.,* ECF No. 4 at 7), but under *Acevedo*, officers did not need a warrant to search the car. Based on the dog alert on the car, the Defendants had probable cause to search the containers within it where narcotics could be concealed, including Ms. Amaru's purse. Therefore, if her purse was inside the car at the time of the search, the search was constitutional.

If the purse was on Ms. Amaru's person during the search, and if her detention is better termed an arrest than a stop, this search could be considered a lawful search incident to arrest. "Incident to a lawful arrest, the police may search: the arrestee's person; any items or containers

that were located on the arrestee's person at the time of the arrest; and any items or containers that were located within the arrestee's reaching distance at the time of the arrest." *United States v. Curtis*, 635 F.3d 704, 712 (5th Cir. 2011); *see also Chimel v. California*, 395 U.S. 752, 762-63 (applies doctrine to both searches for weapons and for evidence). When searching areas within the arrestee's immediate control or areas immediately adjoining the place of arrest, "probable cause or reasonable suspicion is not necessary[.]" *United States v. Mata*, 517 F.3d 279, 285 (5th Cir. 2008). However, probable cause for the underlying arrest is necessary if the arrest is made without a warrant. *Henry v. United States*, 361 U.S. 98, 102 (1959). Additionally, "[a]mong the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Accordingly, because Ms. Amaru was lawfully arrested, if she had the purse on her person, the officers could have lawfully searched it without a warrant as a search incident to arrest.

### e.    The Court should dismiss Ms. Amaru's excessive force claims.

Ms. Amaru argues that Trooper Womack engaged in an "unwarranted use of physical restraint (handcuffs)," causing a "sore wrist." ECF No. 14 at 17. She explains that he temporarily detained her by putting handcuffs on her and placing her on the sidewalk, and that this constituted excessive use of force. ECF No. 14 at 12. She also alleges that "Defendant used excessive force to perform an illegal search of property of plaintiff," (ECF No. 3 at 7 (consolidated case)), but without more explanation, this is merely a "conclusory allegation" that does not survive the *Twombly* plausibility pleading standard.  *See Twombly*, 550 U.S. at 556-57.

Moore responds that Ms. Amaru has not pleaded the elements of an excessive force claim. ECF No. 28 at 19. Debus argues similarly, also adding that in their pleadings, Plaintiffs do not allege that Debus was even present during the incident. ECF No. 29 at 19-20. Martinez does not

address the issue of excessive force, but states that she is only being sued for performing the dog sniff and that in any case, she is entitled to qualified immunity from the Plaintiffs' claims. ECF No. 24 at 3. The City responds that, for this and all other constitutional issues in the case, it cannot be held liable because Plaintiffs have not plausibly pleaded municipal liability. ECF No. 30 at 13.

As noted above, Plaintiffs did not name Trooper Womack as a defendant in this case. ECF No. 14 at 57; ECF No. 15 at 57. Indeed, the Video shows Martinez handcuffing Ms. Amaru, not Trooper Womack. Video at 1:17-1:38. Regardless of who cuffed her, Ms. Amaru pleads, at most, that her handcuffs were too tight or otherwise uncomfortable, causing her to have a "sore wrist." ECF No. 14 at 17. But "[t]ight handcuffing alone, even where a detainee sustains minor injuries, does not present an excessive force claim." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022); *see also Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) ("handcuffing too tightly, without more, does not amount to excessive force."); *Montes v. Ransom*, 219 F. App'x 378, 380 (5th Cir. 2007) (same) (internal citations omitted). Unlike in *Heitschmidt v. City of Hous.*, Ms. Amaru has not alleged serious and permanent injuries for which she required medical treatment. 161 F.3d 834, 840 (5th Cir. 1998). Additionally, even if handcuffing her were unjustified, that does not in itself give rise to an excessive force claim. *Tarver v. City of Edna*, 410 F.3d 745, 751-52 (5th Cir. 2005). Therefore, Ms. Amaru has not stated an excessive force claim based on the use of handcuffs against Trooper Womack, Martinez, or any of the other Defendants.

> **f.    For the same reasons discussed above concerning the Fourth Amendment, the Court should dismiss Plaintiffs' additional claims concerning the traffic stop.**

In their Complaints, Plaintiffs bring causes of action for illegal detention, illegal search and seizure, intentional stop and frisk, and excessive force (*see, e.g.*, ECF No. 3 at 9-13). The undersigned addressed each of these topics in the Fourth Amendment analysis above.

Furthermore, Plaintiffs' "police harassment" cause of action is duplicative of their other causes of action, given their explanation of this phrase. ECF No. 4 at 9. For the same reasons previously stated, Plaintiffs have not pleaded a constitutional violation against the Defendants as to any of these claims, nor have they met their burden of showing that Moore, Martinez, and Debus would not have qualified immunity from these claims. Nor did they plead facts to show the City's municipal liability. Accordingly, the Court should dismiss these additional claims.

### g.    Mr. Amaru has not stated a claim that any Defendant coercively questioned him in violation of the Fifth Amendment.

Plaintiffs also allege "[t]he defendant questions [Mr. Amaru] to coerce in telling any incrimination on [Ms. Amaru] while interrogating [Mr. Amaru]" in violation of the Fifth Amendment. ECF No. 15 at 15; *see also* ECF No. 14 at 37-38. Plaintiffs argue that "[t]he Fifth Amendment protects individuals' due process rights, including the right to be free from self-incrimination." ECF No. 15 at 42. Defendants do not specifically respond to these claims.

The Fifth Amendment "was never intended to permit [one] to plead … that some third person might be incriminated by his testimony, even though he were the agent of such person . . . . [T]he amendment is limited to a person who shall be compelled in any criminal case to be a witness against *himself* . . . " *Hale v. Henkel*, 201 U.S. 43, 69-70 (1906) (emphasis in original) (overruled in part on other grounds by *Murphy v. Waterfront Com'n of New York Harbor*, 378 U.S. 52 (1964)). Accordingly, the Fifth Amendment does not protect Mr. Amaru from providing incriminating information about Ms. Amaru.

Moreover, the Plaintiffs have not pleaded facts to show how Mr. Amaru's questioning was coercive. "In order to determine whether a confession was obtained in violation of a defendant's due process rights, 'courts look to the totality of circumstances to determine whether a confession was voluntary.'" *Sosa v. Dretke*, 133 F. App'x 114, 119 (5th Cir. 2005) (citing

28

*Withrow v. Williams,* 507 U.S. 680, 693 (1993)). The potential circumstances include "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Id.* (citations omitted). "A confession is coerced if the defendant's will was overborne by the circumstances surrounding the confession." *Dickerson v. United States,* 530 U.S. 428, 434 (2000); *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26 (1973). Plaintiffs have not stated facts to show how the Defendants coerced Mr. Amaru or secured involuntary statements about Ms. Amaru from him. Therefore, the Court should dismiss Plaintiffs' claims under the Fifth Amendment for failure to plead a constitutional violation.

> **h.    Moore and Martinez did not violate Ms. Amaru's constitutional rights by not allowing her to use the restroom during the traffic stop.**

Ms. Amaru also alleges that the officers did not allow her to use the restroom during the traffic stop, resulting in a strained bladder. ECF No. 14 at 8. She alleges that this amounts to "failure to provide medical care in temporary custody." *Id.* at 12. The Defendants do not directly respond to these allegations.

"The Due Process Clause of the Fourteenth Amendment guarantees that a person detained by the police is entitled to medical care." *Carter v. Reach*, 399 F. App'x 941, 942 (5th Cir. 2010). "Violation of that right by deliberate indifference to serious illness or injury is actionable under § 1983." *Id.* But "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). "To succeed on a deliberate indifference claim, plaintiffs must show that (1) the official

was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino*, 239 F.3d at 755). Under this test, a defendant acts with deliberate indifference only "if he knows that inmates face a substantial risk of serious bodily harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see Gobert*, 463 F.3d at 346.

The Fifth Circuit consistently has held that "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 645); *see also, e.g.*, *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018); *Gobert*, 463 F.3d at 346 (explaining that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference") (citations omitted). Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot amount to deliberate indifference. *Farmer*, 511 U.S. at 838.

Ms. Amaru has not shown that by being prevented from using the restroom during the detention she experienced a "serious medical need" as described in *Gobert*. *Gobert*, 463 F.3d at 345 n.12. Furthermore, deliberate indifference is "an extremely high standard to meet" (*Domino*, 239 F.3d at 756), and even if officers had been "negligent" or "grossly negligent" in not allowing her to use the restroom, this would still not be enough to state a claim for deliberate indifference. *Thompson*, 245 F.3d at 459. The Video shows that Ms. Amaru walked to a nearby service station shortly after the traffic stop ended, presumably to use the restroom. Video at 49:58-50:39. It also does not show that she complained or otherwise was discomforted by not going to the restroom earlier. Accordingly, Ms. Amaru did not plead facts to state a claim for deliberate indifference to

her serious medical needs when the Defendants did not allow her to use the restroom during the roughly one-hour detention. The Court should dismiss this claim for failure to state a constitutional violation.

> **i.    Plaintiffs have not stated a claim that Moore racially profiled them in violation of the Fourteenth Amendment's Equal Protection Clause.**

Plaintiffs assert that "[r]acial profiling involves the targeting or suspicion of individuals based on their race, ethnicity, or other protected characteristics rather than on evidence of criminal behavior." ECF No. 14 at 7. They state that "by racial and ethnic profiling" them, defendants have breached their duties as public officers. *See, e.g.*, ECF No. 4 at 9. They argue that because of their Indigenous American nationality, defendants assumed they had drugs or were engaged in illegal activity and did not simply give them a traffic ticket or let them go free. *Id*. at 11. The Video shows Moore talking to Mr. Amaru, mentioning that the dog alerted "for a reason," and saying, "That's why I ask, 'cause you have all the Indian stuff. Did you have any, like, ceremonial stuff to—or anybody smoking weed that maybe was around you that could have been close enough that—" Video at 4:45-4:58. A moment later, Moore again uses the phrase, "when you're doing your ceremonial stuff," when trying to elicit information from Mr. Amaru. *Id*. at 4:58-5:04.

Moore responds that Plaintiffs failed to show that he treated them differently than "similarly situated non-indigenous Americans." ECF No. 28 at 21. Debus makes similar arguments. ECF No. 29 at 20-21. Martinez references racial profiling only briefly when explaining that qualified immunity shields her from liability. ECF No. 24 at 4. The City does not directly address the issue of racial profiling in its Motion. ECF No. 30.

To state a claim of racial profiling under the Fourteenth Amendment, a plaintiff must "allege and prove that [she] received treatment different from that received by similarly situated

individuals and that the unequal treatment stemmed from a discriminatory intent." *Stout v. Vincent*, 717 F. App'x. 468, 471-72 (5th Cir. 2018). Furthermore, "[t]he right to be free from invidious racial discrimination is clearly established." *Nguyen v. La. State Bd. of Cosmetology*, 236 F. Supp. 3d 947, 959 (M.D. La. 2017). Discriminating against people "solely because of their ancestry" is by its very nature "odious to a free people[.]" *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013). Administering a facially neutral law "exclusively against a particular class of persons ... require[s] the conclusion that" it is applied so "unequal[ly] and oppressive[ly] as to amount to a practical denial by the state of that equal protection of the laws which is secured" by the Fourteenth Amendment. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). Thus, the right to equal protection was clearly established at the times at issue in this case and has been clearly established since the Supreme Court's decision in *Yick Wo.*

Although the Video reflects that Moore noticed and asked about the Indigenous items in Mr. Amaru's car, this does not meet the standard for Fourteenth Amendment racial profiling claims. The Fifth Circuit recently explained that a plaintiff's "Fourteenth Amendment selective enforcement claim [ ] required her to identify 'examples' of similarly situated individuals who were nonetheless treated differently." *Villarreal v. City of Laredo, Tex.*, 94 F.4th 374, 398 (5th Cir. 2024) (citing *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 514 (5th Cir. 2021)). Plaintiffs have not provided any examples of non-Indigenous motorists who were similarly situated to them but who Officer Moore treated differently. Nor have they pleaded facts to show that Moore acted with a discriminatory intent in pulling them over, detaining them, and searching their car. Therefore, they have not stated a claim that Moore violated their Fourteenth Amendment rights.

> **j.** **The Court should dismiss Plaintiffs' claims under criminal laws without leave to amend and dismiss all other claims with leave to amend.**

The law does not provide Plaintiffs with a private right of action to pursue civil liability for violation of criminal statutes, as private citizens generally have "no standing to institute a federal criminal prosecution and no power to enforce a criminal statute." *Gill v. Texas*, 153 F. App'x 261, 262 (5th Cir. 2005); *see also Russell v. Morath*, No. 3:22-cv-1842-G-BK, 2022 WL 6785806, at *1, *3 (N.D. Tex., Sept. 23, 2022) (interpreting 25 C.F.R. § 11.404 as a criminal provision that does not provide private plaintiffs with a cause of action), *rec. adopted*, 2022 WL 6778995 (N.D. Tex., Oct. 7, 2022); *see also Denezpi v. United States*, 596 U.S. 591, 596 (2022) ("That complaint charged Denezpi with three *crimes*: assault and battery, in violation of 6 Ute Mountain Ute Code § 2 (1988); terroristic threats, in violation of 25 C.F.R. § 11.402; *and false imprisonment, in violation of 25 C.F.R. § 11.404*.") (emphasis added). The Court construes Plaintiffs' references to "intimidation" (*see, e.g.*, ECF No. 4 at 10) as falling within 18 U.S.C. § 241 and thus not providing a civil cause of action. *See United States v. Guest*, 383 U.S. 745, 757-60 (1966) (addressing intimidation as part of an attempt to interfere with the constitutional right to travel on public roadways). Likewise, Plaintiffs cannot assert violations of the Texas Penal Code or Code of Criminal Procedure as a claim for civil liability. *Pinedo v. City of Dall.*, *Tex.*, No. 3:14–cv–0958–D, 2015 WL 221085, at *9 n.3 (N.D. Tex. Jan. 15, 2015).

Plaintiffs cannot cure the fact that they are not the proper parties to bring a case for violation of criminal statutes. Accordingly, the Court should dismiss without leave to amend all of Plaintiffs' claims based on violation of federal and Texas criminal statutes as well as any claims under the Uniform Code of Military Justice (10 U.S.C. § 897, Art. 97), which simply is inapplicable to this case. *See id.* § 802 Art. 2.

Likewise, the Court should dismiss any claims that Plaintiffs assert based on the claims of their children. Except for certain types of cases where a statute permits parents to represent their children pro se, the law generally prohibits them from doing so. *Raskin ex rel. JD v. Dall. Indep. Sch. Dist.*, 69 F.4th 280 (5th Cir. 2023). Therefore, Plaintiffs cannot themselves assert the independent claims of their children in this case. But even if the law permitted this, the Video does not demonstrate that any children were present during the traffic stop at issue. On the contrary, it shows a car so full of belongings that no children could fit inside, and no children standing by the roadside. For this additional and independent reason, the Court should dismiss any claims the Plaintiffs assert on behalf of their minor children. *Scott v. Harris*, 550 U.S. 372, 378 (2007) ("The videotape tells quite a different story.").

Defendants urge the Court to dismiss many of Plaintiffs' claims with prejudice because the Plaintiffs have abandoned such claims (*see, e.g.*, ECF No. 117 at 3-4). However, the Court finds that Plaintiffs' responses tend to reiterate the same or similar claims as those made in their Complaints, suggesting that they are standing on those claims, rather than abandoning them. Accordingly, the Court should dismiss most of the Plaintiffs' claims with leave to amend them because it does not appear that the defects identified above are incurable, or that the Plaintiffs have pleaded their best case. However, Plaintiffs' claims for violations of criminal laws and claims asserted on behalf of their minor children cannot be cured by amendment, and the Court should dismiss them without leave to amend.

## IV.   CONCLUSION

After considering the pleadings and applicable legal authorities, the undersigned **RECOMMENDS** that Judge O'Connor **DENY** the Plaintiffs' constitutional challenges (ECF Nos. 74-75; and ECF Nos. 37, 38, 39, 40, 61 containing earlier versions of these challenges),

**GRANT** the Defendants' Motions (ECF Nos. 23, 28, 29, 30, 98, 100, 102, 106) and **DISMISS** Plaintiffs' claims with leave to amend, except as to their claims based on criminal law and those asserted on behalf of their minor children, which Judge O'Connor should dismiss without leave to amend.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), modified by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).

**SIGNED** on August 1, 2024.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE